IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SARAH STIPKOVICH,                               )        CASE NO. 1:20cv509
                                                )
                        Plaintiff,              )
                                                )        JUDGE BENITA Y. PEARSON
                v.                              )
                                                )        MAGISTRATE JUDGE
                                                )        KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                          )
SECURITY ADMINISTRATION,                        )
                                                )        **REPORT AND RECOMMENDATION**
                        Defendant.              )

Plaintiff Sarah Stipkovich ("Stipkovich") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and

Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

Stipkovich filed an application for DIB in October 2018, alleging a disability onset date

of March 9, 2018.  Tr. 155.  She alleged disability based on the following: chronic migraines,

PTSD, depression, and anxiety.  Tr. 186.  After denials by the state agency initially (Tr. 67) and

on reconsideration (Tr. 84), Stipkovich requested an administrative hearing.  Tr. 92.  A hearing

was held before an Administrative Law Judge ("ALJ") on October 8, 2019.  Tr. 27-51.  In his

October 21, 2019, decision (Tr. 12-22), the ALJ determined that there are jobs that exist in

significant numbers in the national economy that Stipkovich can perform, i.e., she is not

disabled.  Stipkovich requested review of the ALJ's decision by the Appeals Council (Tr. 151) and, on December 31, 2019, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Stipkovich was born in 1987 and was 30 years old on her alleged onset date.  Tr. 20.  She served in the Marine Corps and completed three years of college.  Tr. 31, 186.  She last worked in March 2018.  Tr. 32.  Her past work experience includes claims assistant and legal file clerk. Tr. 45, 187.

### B.  Relevant Medical Evidence[1]

On June 30, 2017, Stipkovich went to the emergency room complaining of anxiety, chest tightness and nausea triggered by an argument with her husband.  Tr. 263.  She was very tearful. She was not taking medication for anxiety, explaining that she had hydroxyzine at home but that it was not effective.  She had taken trazodone prior to her visit but it did not seem to work.  She reported that she is normally able to deal with her anxiety on her own but was unable to do so on that day.  Upon exam, she appeared tearful and anxious and had a depressed mood.  Tr. 264.  She was oriented to person, place and time; was not in distress; and had normal speech, behavior, thought content, cognition, and memory.  She was counseled, reported feeling better, discharged with a diagnosis of anxiety, and provided prescriptions for Ativan and Zofran.  Tr. 265.

On July 5, 2017, Stipkovich saw Dr. Stafford, Ph.D., at the Veterans Affairs Medical Center (hereinafter, "VA") for a psychiatric consultation.  Tr. 304.  She reported a history of depression after the birth of her first child, in 2009, and a provisional diagnosis of PTSD.  Tr.

---

[1] Stipkovich only challenges the ALJ's determination of her mental health impairments.  Thus, only those impairments will be summarized and discussed below.

305.  Dr. Stafford diagnosed Recurrent Depressive Disorder and chronic PTSD.  She assessed Stipkovich as "open and reflective with a number of longstanding concerns about herself and relationships, trauma and symptoms of anxiety and depression."  Tr. 307.  Stipkovich was committed to ongoing treatment and was to return for a follow up on July 20.  Tr. 307.

On January 9, 2018, Stipkovich saw Dr. Prewitt, Ph.D., at the VA for a psychiatric assessment.  Tr. 405.  Stipkovich reported that she was married with three young children, worked full time, and was a part-time student working on her associate degree.  Tr. 406.  She reported that she was experiencing anxiety due to worry over various stressors and had a history of depression that improved when her situational stressors improved.  She also reported a history of sexual abuse.  Upon exam, she was alert and oriented, casually and appropriately dressed, had a sad mood and an appropriate affect, and was engaged throughout the assessment.

On February 28, 2018, Stipkovich returned to Dr. Prewitt for counseling.  She stated that she felt overwhelmed by the responsibilities of carrying for two new puppies and unsure about her recent decision to quit her job to focus on school full time.  Tr. 397.  She stated that her job resignation was "better for her mental health."  Upon exam, she was alert and oriented, appropriately dressed, expressed sadness and worry, and had an appropriate affect.

On March 27, 2018, Stipkovich returned to Dr. Prewitt and reported that she continued to feel overwhelmed due to marital problems and was considering a separation.  Tr. 396.  Upon exam, she was alert and oriented, appropriately dressed, expressed worry and tearfulness, and had an appropriate affect.

On April 13, 2018, Stipkovich returned for counseling at the VA and saw Dr. Kneting, Ph.D.  Tr. 302.  Dr. Kneting observed that she was appropriately dressed, had good grooming and hygiene, and excellent eye contact.  Her affect was full range and congruent, she became

3

tearful at times, and she had a dysthemic mood.  Her speech and thought process and content were normal, her insight and judgment appeared good, and rapport was fairly well established. Tr. 302-303.  Stipkovich reported that she was currently going to school full time, she was the primary caretaker of her three children, who each participated in two sports, and she had taken on two new puppies.  Tr. 303.  Dr. Kneting noted a history of sexual abuse; diagnosed PTSD; and, per Stipkovich's request, referred her to women's group therapy.

On June 5, 2018, Stipkovich saw Dr. Prewitt.  Tr. 390.  She reported that she had recently graduated with an associate degree and would soon be starting a bachelor's degree program full time.  She continued to report stress from marital problems as well as issues with her father and stepfather.  She stated that she had been thinking of cutting herself to deal with her emotional pain because she felt she had no one to talk to, but she had not acted on those thoughts.  Upon exam, she was alert and oriented, appropriately dressed, expressed worry, guilt, confusion and tearfulness, and had an appropriate affect.  Dr. Prewitt recommended journaling and other coping skills when she thought of cutting herself.

On June 12, 2018, Stipkovich started group therapy at the VA.  Tr. 388-389.  During the session she expressed significant discomfort, became quite tearful, and had to excuse herself. She was able to regulate herself and return to the group, although she was observed to be very anxious and was unwilling to speak.  The next week she participated appropriately, identifying that she was prone to anxiety and hoped to be able to talk to others without crying.  Tr. 386.  She also had an individual therapy session that day and reported not having expected to share her feelings in group therapy so soon.  Tr. 387.  She felt connected to the other women in the group, supported by the group leader, and planned to continue although it was hard.

On July 3, 2018, Stipkovich saw clinical psychologist Dr. Serna at the VA for an

evaluation of her mental conditions, and Dr. Serna completed a PTSD disability questionnaire on her behalf.  Tr. 375-385.  Stipkovich had had prior, similar evaluations in 2013, 2015 and 2017. Tr. 377.  During the exam, Stipkovich discussed her marital problems and concerns about being a good mother to her three children.  Tr. 377-78.  She reported having last worked at the VA, but she did not like the job and quit before she was fired for not meeting her job quota.  Tr. 378. Since then, she had completed an associate degree program and had begun working on a bachelor's degree in child psychology.  Tr. 379.  She planned to return to work after she graduated; her goal was to work only in jobs that she would enjoy.  She reported thoughts of cutting herself, especially due to her husband's behavior, and difficulty with depression and anxiety, including periods of panic.  Tr. 379-380.  She did not want to try taking medications to manage her symptoms.  Tr. 381.  She had tried some anti-depressants in the past but did not take them for long before discontinuing.  She had been prescribed trazadone to help her sleep although it did not help much and she felt groggy when she took it.  Tr. 380-381.  Upon exam, she was friendly and cooperative, open and forthcoming, and actively participated.  Tr. 383.  She had normal speech, a mildly anxious but euthymic mood with appropriate affect, she became tearful at times when discussing difficult subjects, and she endorsed some thoughts of self-harm by cutting.  Dr. Serna concluded that, overall, Stipkovich seemed somewhat worse than she had in her last VA evaluation, as evidenced by her leaving her job to focus on her schooling, but he observed that balancing a career, education, and child care would be difficult for anyone and that Stipkovich cutting back on those activities was not an obvious sign of declining function.  Tr. 384.  Furthermore, Dr. Serna commented, Stipkovich appeared to be going through a crisis in her marriage and "it is likely that any decline in [her] functioning is attributable to [that]."  Dr. Serna concluded that, despite her symptoms, she showed a good ability to succeed, and the impact of

her mental issues appeared relatively mild.  Tr. 385.

Later that day, Stipkovich attended a group therapy session and reported having gone to an amusement park with a friend at a time when the crowd sizes were low.  Tr. 373.

On July 31, 2018, Stipkovich returned to group therapy with Dr. Knetig.  Tr. 300.  Dr. Knetig commented that Stipkovich expressed a sense of accomplishment for completing her trauma narrative, conveyed feeling depressed, and continued to show more self-regulation during the session.  The same day she had individual counseling and endorsed a "stressed" mood.  Tr. 301-301.  Upon exam, she was alert and oriented, had normal speech and thought content and process, she was polite, cooperative, and open, and had good insight and judgment.  Tr. 301.

On August 8, 2018, Stipkovich went to group therapy and expressed concerns about returning to school full time and feeling overwhelmed.  Tr. 299-300.  She also stated that she was recently assigned a mentee in a mentoring program she was involved in.  She was observed to have not reacted when a fellow group member read her trauma narrative as she had done in the past, but, rather, endorsed being able to "handle it" and became tearful afterwards.

On August 14, 2018, Stipkovich attended group therapy and appeared tearful upon arrival, noting that she had been more depressed lately due to going through a separation from her husband.  Tr. 298-299.  She was observed to be increasingly active and open and responded well to questions.

On August 15, 2018, Stipkovich saw Dr. Tamayo-Reyes, M.D., at the VA for medication management.  Tr. 295.  The last time she had seen Dr. Tamayo-Reyes was in September 2017.  She had not been taking her lithium as she felt that it did not help.  She reported having the "worst year yet," separating from her husband, and had had thoughts of cutting herself to have a sense of release.  Upon exam, she was cooperative with intermittent eye contact; her mood was

depressed and overwhelmed; her affect was tearful, euthymic, with a good range; and she had normal thought content and process, cognition, and memory.  Tr. 297.  Dr. Tamayo-Reyes diagnosed major depressive disorder, recurrent, moderate, and PTSD.  Tr. 298.  She prescribed a trial of duloxetine for depression, continued her trazodone for sleep, and recommended continued therapy.  Tr. 298.

In a decision dated August 29, 2018, Stipkovich was found to be entitled to individual unemployability benefits by the Department of Veterans Affairs effective March 10, 2018.  Tr. 279-282.

On October 2, 2018, Stipkovich saw Dr. Prewitt for counseling.  Tr. 293-294.  She stated that she had been journaling her emotions, which she found helpful.  She was pursuing a legal separation from her husband and was attending classes full-time.  Upon exam, she was alert and oriented, appropriately dressed, and she had a euthymic mood and an appropriate affect.

On November 13, 2018, Stipkovich returned to Dr. Prewitt for therapy.  Tr. 458-459. She had decided to file for divorce, which she felt good about doing.  She indicated that she was being investigated for overtime fraud at her prior job, and her fears related to that.  She relayed that she felt that her stress from those issues had impacted her functioning at school (she had a history of getting straight A's).  Dr. Prewitt agreed to provide a letter for Stipkovich to give her professors stating that she was receiving mental health treatment.  Upon exam, she was alert and oriented, appropriately dressed, she had a euthymic mood and an appropriate affect, and she denied urges to cut herself.

On November 24, 2018, Stipkovich went to the emergency room complaining of a three-day history of a tingling sensation all through her body and feeling that her heart was beating fast then skipping beats.  Tr. 527.  She reported a history of anxiety and intermittent panic attacks.

Upon exam, she had normal speech and behavior, normal thought content, and was tearful and anxious.  Tr. 528-529.  She stated that she was under a lot of stress and admitted to not being completely compliant with her medications.  Tr. 529.  She was prescribed a short-term course of Ativan and it was recommended she take her prescribed medications daily and see her physician.  Tr. 529.  She was discharged home in stable condition with a diagnosis of anxiety, heart palpitations.

On January 25, 2019, Stipkovich saw Dr. Tamayo-Reyes for medication management.  Tr. 614-615.  She was last seen in August 2018.  Her divorce was final and she was in her last semester at school.  Her mood was manageable considering the difficulties she had been going through.  She reported that her duloxetine was beneficial.  She had difficulty sleeping.  Upon exam, she was cooperative with appropriate eye contact, she had an "okay considering" mood and a constricted affect, intact cognition and memory, and fair judgment and insight.  Dr. Reyes-Tamayo diagnosed her with major depressive disorder, recurrent, mild, and PTSD.  Tr. 616.  She continued her duloxetine and changed her sleep medication.  Tr. 617.

On February 12, 2019, Stipkovich saw Dr. Prewitt for counseling.  Tr. 612-613.  She reported feeling overwhelmed with her ex-husband's behavior and related that she cut herself to relieve some of her emotional pain.  Upon exam, she was alert and oriented, appropriately dressed, and she had a sad mood, appropriate affect, and logical thought process.

On March 26, 2019, Stipkovich saw Dr. Tamayo-Reyes for medication management.  Tr. 661.  Stipkovich reported that the trazadone worked better for sleep and she preferred to be on that.  She described her mood to be "everywhere," it fluctuated with the warmer weather; at times she questioned her purpose; and she had inconsistent motivation, describing a desire to coach her child's team one moment and then having no motivation to do so at other times.  Tr.

662.  She had increased anxiety related to her struggle to continue school and had only a few months before graduating.  Here anxiety and mood were affecting her performance at school, she felt exhausted, and she had difficulty concentrating and racing thoughts.  She had had migraine headaches as well, which was making matters worse, and sometimes she had been unable to make it to class.  Upon exam, she had good grooming and hygiene, was cooperative with appropriate eye contact, described her mood as "up and down" and had a dysthymic affect with constricted range, normal speech and thought content and process, intact cognition and memory, and fair insight and judgement.  Tr. 663-664.  She was diagnosed with major depressive disorder, recurrent, moderate, and PTSD, and her duloxetine was increased.

On April 16, 2019, Stipkovich saw Dr. Prewitt for therapy, reporting problems with her ex-husband.  Tr. 660-661.  Upon exam, she was alert and oriented, appropriately dressed, had a sad mood and appropriate affect, and logical thought process.  On May 8, she reported continuing to feel overwhelmed with parenting, her ex-husband, and school.  Tr. 659.  Her final exams were that week.  She stated that she had cut herself to relieve feeling emotionally drained.  Her exam findings were the same as her last visit.  Tr. 660.  On June 19, Stipkovich discussed her divorce problems, felt that no one needed her anymore because her kids were visiting their grandparents, and related financial distress that prevented her from taking her final two classes during the summer.  Tr. 728-729.  Her exam findings were the same as her prior visit.  On July 10, Stipkovich reported issues with her ex-husband that required police involvement.  Tr. 724-725.  She had to drop her two classes for financial reasons.  She was dating someone new and enjoyed reconnecting to some activities she used to enjoy, like basketball and swimming.  Her exam findings were as before, except for her mood was not sad but "she expressed a range of emotions."

On July 16, 2019, Stipkovich saw Dr. Tamayo-Reyes and related "significant difficulties" with her ex-husband, including continued need for police involvement.  Tr. 714.  Her children were visiting with her ex-husband's parents.  She recently started binge drinking and not taking her medications, but she realized it was a mistake and stopped drinking and resumed taking her medication.   She reported feeling worried and her mind was racing.  She was looking for work and indicated that she may work as a server where her sister works.  Upon exam, she was cooperative with appropriate eye contact, had a "worried" mood, a dysthymic, tearful, and constricted affect, normal speech and thought content/process, intact cognition and memory, and fair insight and judgment.  Tr. 716.   Dr. Tamayo-Reyes diagnosed major depressive disorder, moderate to severe, and PTSD, and continued her medications and treatment.  Tr. 716-717.

On August 7, 2019, Stipkovich saw Dr. Prewitt.  She reported continuing to enjoy spending time with her new male friend.  Tr. 713.  She stated that she was experiencing financial distress and stress related to her ex-husband.  Upon exam, she was alert and oriented, appropriately dressed, her thought process was logical, and she had a euthymic mood and an appropriate affect.  Tr. 714.

## C. Opinion Evidence

### 1. Treating Source Opinion

On September 10, 2019, Dr. Tamayo-Reyes completed a mental residual functional capacity questionnaire on Stipkovich's behalf.  Tr. 731-736.  She listed Stipkovich's diagnoses as major depressive disorder, moderate to severe, and PTSD.  She stated that Stipkovich had had a minimal to modest response to treatment.  She listed the following clinical findings: dysthymic, tearful and constricted affect with soft, monotone speech.  Regarding Stipkovich's abilities to perform activities, Dr. Tamayo-Reyes opined that Stipkovich was "seriously limited, but not

precluded" in all areas and that she would miss about four workdays per month.

### 2. State Agency Reviewing Physicians

On November 26, 2018, state agency psychologist Dr. Matyi, Ph.D., reviewed Stipkovich's record and opined that she could perform simple repetitive and moderately complex tasks in a non-fast-paced, high-production setting; occasionally and superficially interact with others; and adapt to minor, infrequent changes in the work setting.  Tr. 61-64.  On January 3, 2019, state agency psychologist Dr. Warren, Ph.D., adopted Dr. Matyi's findings.  Tr. 77-81.

### D.  Testimonial Evidence

### 1. Stipkovich's Testimony

Stipkovich was represented by counsel and testified at the administrative hearing.  When asked what was significant about her alleged onset date in March 2018, Stipkovich stated that her symptoms had gotten worse.  Tr. 32.  She wasn't able to keep up with her job, it got very stressful and overwhelming, and she quit her job to take care of her kids because she couldn't do both.  Tr. 32.  She also wanted to pursue school full time and, after she stopped working, she enrolled in school full time to study psychology.  Tr. 33.  She quit school about a year later because it was very stressful.  Tr. 34.  She couldn't focus on her work and she didn't want to get a failing grade.  Tr. 34.

Stipkovich confirmed that she had been diagnosed with major depressive disorder and PTSD.  Tr. 35.  She explained that she had panic and anxiety attacks 3-4 times a week (they last about an hour) and that they hindered her thinking, memory, and focus.  Tr. 35, 36.  Her PTSD is from being assaulted while in the military and is the basis for her VA unemployability application.  Tr. 32, 36.  When asked if she has learned any techniques to control her anxiety symptoms, Stipkovich answered that she is currently working on that with her therapist.  Tr. 36.

11

Her PTSD symptoms include daily nightmares, flashbacks, she breaks out in a sweat, and she has anxiety and panic attacks.  Tr. 37.  Being in large crowds triggers her flashbacks so she tries to avoid crowds and also males.  Tr. 37.

Stipkovich is in individual therapy currently and she completed group therapy for her PTSD.  Tr. 37-38.  She is also in family therapy; she has three children who live with her ex-husband.  Tr. 38.  She currently lives with her mother and sees her children once a week.  Tr. 39.  She tries to keep up with the household chores but it is hard for her at times.  Tr. 39.  She does not go to the grocery store; rather, she orders groceries online and has them delivered.  Tr. 39.

Stipkovich confirmed that she has had urges to cut herself and has engaged in that behavior in the past.  Tr. 43.  She has also had passive suicide ideation, which has not improved.  Tr. 43.  She acknowledged that the state agency reviewer had indicated that she was working full time, going to school, and teaching Zumba (a dance fitness class).  Tr. 43.  She stated that she stopped teaching Zumba 4 or 5 years ago.  Tr. 43.  She could no longer do that or other activities because "things just started being unmanageable" and she had a hard time dealing with her worsening symptoms.  Tr. 44.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 45-48.  The ALJ discussed with the VE Stipkovich's past relevant work as an administrative clerk and a file clerk.  Tr. 45.  The ALJ asked the VE to determine whether an individual with Stipkovich's age, education and work experience could perform her past work or any other work if she had the limitations subsequently assessed in the ALJ's RFC determination, described below.  Tr. 46.  The VE answered that such an individual could not perform Stipkovich's past work but could perform the following jobs with significant numbers in the national economy: housekeeper, general office helper, and

laundry folder.  Tr. 46-47.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

13

capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his October 21, 2019, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.  Tr. 14.

2. The claimant has not engaged in substantial gainful activity since March 9, 2018 the alleged onset date.  Tr. 14.

3. The claimant had the following severe impairments: anxiety disorder with posttraumatic stress, depressive disorder, and migraine.  Tr. 14.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 14.

5. The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions (meaning no arbitration, negotiation, or confrontation), no interaction with the general public as a job requirement, and without concentrated exposure to vibration, high background noise, industrial lighting, or hazards (heights, machinery, or commercial driving), as in a factory setting.  Tr. 16.

6. The claimant is unable to perform any past relevant work.  Tr. 20.

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

7.     The claimant was born in 1987 and was 30 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 20.

8.     The claimant has at least a high school education and is able to communicate in English.  Tr. 20.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 21.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 21.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 9, 2018, through the date of this decision.  Tr. 21.

## V. Plaintiff's Arguments

Stipkovich argues that substantial evidence does not support the ALJ's RFC determination.  Doc. 10.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d

15

383, 387 (6th Cir. 1984).

Stipkovich asserts that the ALJ's conclusion that she is capable of performing simple, routine, low stress work "with some limitation in interaction with others is not square with the compelling record of documentary evidence in this matter, including voluminous patient notes of individual and group psycho-therapy, the well-supported opinion of Plaintiff's treating psychiatrist, and the findings of the Department of Veterans Affairs in awarding Plaintiff service-connected disability."  Doc. 10, p. 11.

*Voluminous patient notes from therapy*: Stipkovich argues that the ALJ's decision recited information found in Stipkovich's treatment notes "but is devoid of analysis or resolution of conflicting findings."  Doc. 10, p. 12.  She contends that the ALJ failed to "square" the normal findings (fully oriented and alert, appropriately dressed, and no suicidal or homicidal ideation) with the abnormal findings (appeared tearful and worried at times, her history of cutting herself). She also complains that the ALJ recited a treatment note from a visit with Dr. Tamayo-Reyes in July 2019 as showing Stipkovich to be tearful and worried with a constricted affect and that "the remainder of her mental status examination was normal."  Doc. 10, p. 12 (citing Tr. 18). Stipkovich contends that the ALJ's "logic is flawed" because being tearful, worried, and having a constricted affect are not "normal" exam findings.  Doc. 10, p. 12.

First, with respect to the July 2019 treatment note, the ALJ's logic is not flawed because the ALJ stated that the *remainder* of the exam findings were normal, not that being tearful, worried, and having a constricted affect was normal.

Stipkovich objects to the ALJ's statement that in March 2019 she "was experiencing stress from her relationship with her ex-husband, parenting and schooling, which led her to cutting herself."  Doc. 10, pp. 12-13.  She submits that the record includes multiple instances in

which she endorsed self-mutilation or thoughts of cutting herself to relieve some of her emotional pain.  Id. (citing Tr. 612, 659-660, 661-664).  But thoughts of cutting herself does not equate to actually cutting herself, which the ALJ accurately stated did occur around March 2019.  Tr. 18 (ALJ's decision citing Tr. 659 (May 2019 note), 661-662 (April 2019 note wherein Stipkovich admitting to cutting herself "last month").  Thus, Stipkovich's apparent assertion that the ALJ did not recognize treatment notes indicating that she cut herself is incorrect.

Stipkovich argues that, when characterizing her group therapy, the ALJ stated that she learned better coping skills in group therapy sessions.  Doc. 10, p. 13; Tr. 17 (ALJ's decision citing Tr. 299-300, 369, 385).  She does not dispute that the records show that she learned better coping skills in group therapy sessions related to her PTSD, as the ALJ stated.  See Tr. 299-300 (group therapy note observing that Stipkovich was able "to handle it" when another member recited her trauma narrative and did not shake or tear up during the narrative as she had before), 369 (Stipkovich "spontaneously disclose[d] much of her trauma narrative" and was able to regulate herself and remain in the room; "Did some unexpected, and excellent work"), 385 (Stipkovich participated more that day, her eye contact was improving, and she related that she had had a busy week, including taking a final exam, and had a good relationship with her therapist).

Stipkovich's statement that, despite her increased coping skills, "her presentation clearly conveys instability," is not well taken.  First, as noted, she does not dispute that she showed improvement.  Moreover, as the ALJ noted, despite presenting as tearful, anxious, depressed, overwhelmed, etc., she had intact concentration and memory, was always fully oriented and appropriately dressed, was often engaged and cooperative, had normal thought processes and content, appropriate eye contact, and fair to good insight.  Tr. 17.  Stipkovich argues that these

normal findings do not "negate any evidence of [her] allegations concerning the severity of her ongoing issues."  Doc. 10, p. 13.  But the ALJ did not find that the normal findings "negated" any evidence of her issues; rather, the ALJ found that, due to her issues, she was limited to performing routine tasks in a low stress environment with superficial interpersonal interactions and no interactions with the general public.

The ALJ also explained that Stipkovich's medications helped her symptoms.  At times when her condition worsened, she reported having not taken her medications, and, upon restarting them, her condition improved.  Tr. 17-18, 19.  While she stated that she had quit her job due to feeling overwhelmed, the ALJ observed that she was also in school at the time.  Tr. 17.  Her stress was often situational, related to her marriage and subsequent divorce, as well as financial problems, parenting her three children, and her schooling, yet she was able to enjoy spending time with a new friend and she was looking for work as a server.  Tr. 18.  In short, the ALJ resolved any conflicts in the evidence, and Stipkovich's assertion that she continued to present as "clearly unstable" is not borne out by the evidence.  The ALJ disagreed, and his decision is supported by substantial evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

*The opinion of treating psychiatrist Dr. Tamayo-Reyes*: The parties agree that the Commissioner eliminated the treating physician rule for applications filed on or after March 27, 2017, and that the Social Security Administration adopted new regulations for agency review of disability claims involving opinion evidence.  Doc. 10, p. 14, n.1; Doc. 12, p. 12; *see also* 20 C.F.R. § 416.920c.  Stipkovich states that the new regulation does not apply to her because she filed her application before March 27, 2017 (Doc. 10, p. 14, n.1), but she is mistaken.

Stipkovich filed her application in October 2018.  Therefore, the new regulation applies to her case.

Under the new regulation, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from [a claimant's] medical sources."  20 C.F.R. § 416.920c(a).  The Commissioner evaluates the persuasiveness of all medical opinions and prior administrative medical findings using the factors set forth in the prior regulations (supportability; consistency; treatment relationship, including length, frequency, purpose, and extent; specialization; and other factors), but supportability and consistency are the most important factors.  *Id.*  The Commissioner will explain the supportability and consistency when discussing a treating source opinion; the Commissioner is not required to discuss the remaining factors, although the Commissioner is permitted to do so.  § 416.920c(b)(2).  "Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'"  *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (quoting *Ryan L.F. v. Comm'r of Soc. Sec.*, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019).  "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion."  *Id.* (internal quotation marks and citation omitted).

Stipkovich complains that the ALJ found the state agency reviewers' opinions more persuasive than her treating psychiatrist, Dr. Tamayo-Reyes.  Doc. 10, p. 15.  She asserts that Dr. Tamayo-Reyes's opinion is more persuasive.  Id.  However, other than making that bald

assertion, Stipkovich does not provide argument or evidence showing that the ALJ's decision regarding Dr. Tamayo-Reyes's opinion is unsupported by substantial evidence.  The fact that Dr. Tamayo-Reyes is, allegedly, a physician board-certified in psychiatry whereas the state agency reviewers are "PhD psychologists" does not describe an error or show that the ALJ's decision is unsupported by substantial evidence.  The fact that the state agency reviewers did not review all the evidence before generating their opinions (Doc. 10, p. 16) is not erroneous because the ALJ considered the additional evidence created after the reviewers generated their opinions.  Tr. 17-18; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2010) (finding no error when state agency reviewing physicians' RFCs were completed prior to record evidence when the ALJ considered the later evidence); *McGrew v. Comm'r of Soc. Sec.*, 343 Fed. App'x 26, 32 (6th Cir. 2009) (an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error when the ALJ considered the evidence that developed after the issuance of those opinions).

Finally, to the extent Stipkovich argues, in a footnote, that the "treating physician rule" still survives despite the new regulation eliminating that rule (Doc. 10, pp. 14-15, n.1), such an argument fails.  For one, an argument that is only contained in a footnote does not preserve an issue for review.  *United States v. Dairy Farmers of Am., Inc*., 426 F.3d 850, 856 (6th Cir. 2005).  For another, that argument has been rejected by other courts, and the undersigned finds their reasoning persuasive.  *See, e.g*., *Pennock v. Comm'r of Soc. Sec. Admin*., 2020 WL 6796768, at *3 (D. Ariz. Nov. 19, 2020) (rejecting the plaintiff's argument that the treating physician rule remains valid despite the new regulations rescinding that rule for applications filed after March 27, 2017); *see also Barber v. Sec'y of Health & Human Servs*., 870 F. Supp. 181, 186 (E.D. Mich. 1994) ("The Court further concurs in the Magistrate Judge's belief that the Sixth Circuit

will uphold the new regulation, as did the Second Circuit[,]" citing *Schisler v. Sullivan*, 3 F.3d 563 (2d Cir. 1993) ("[T]he fact that differences may exist between the new regulations and our version of the treating physician rule does not invalidate the regulations.")).

In sum, Stipkovich has not described an error regarding the ALJ's assessment of Dr. Tomayo-Reyes's opinion.

*The service-connected disability found by the Department of Veterans Affairs*: Stipkovich argues that the ALJ "failed to properly evaluate the evidence concerning [her] award of service-connected benefits from the Veteran's Administration." Doc. 10, p. 13. However, as Stipkovich concedes (Doc. 10, p. 13-14), and as the ALJ noted (Tr. 18), under the new medical opinion regulations there is no requirement that the ALJ analyze determinations made by other state governmental agencies. 20 C.F.R. § 404.1504. Section 404.1504 states,

> Other governmental agencies and nongovernmental entities—such as the Department of Veterans Affairs, … for their own programs using their own rules. Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules. Therefore, in claims filed [] on or after March 27, 2017, we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 404.1513(a)(1) through (4).

*Id*. Stipkovich does not contend that the ALJ did not consider the supporting evidence underlying the VA's decision and, in fact, the bulk of the evidence the ALJ considered was from the VA, as that is where Stipkovich received counseling. See also Tr. 19 (ALJ's decision explaining the weight given to VA psychologist Dr. Serna's opinion).

For all the reasons stated above, the decision of the Commissioner should be affirmed.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: January 21, 2021

*/s/Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).